**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-24-00428-001-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Alex Javier Medina-Penuelas, | |
| Defendant. | |

Pending before the Court is Defendant's motion to suppress.  (Doc. 46.)  Defendant seeks to suppress "all statements made to the DEA task force officers in this case after his arrest on February 13, 2024, as well as his actions taken during interrogation when he was asked to direct them to other drug activity."  (*Id.* at 1.)

For the reasons that follow, the motion to suppress is denied.

## RELEVANT BACKGROUND

I.    Undisputed Facts

A.    **The Arrest**

On February 13, 2024, DEA agents were contacted by a confidential source ("CS") who stated that an unidentified source of supply ("SOS") was interested in selling 35 pounds of methamphetamine.  (Doc. 46 at 2.)  The CS also stated that the SOS had provided the phone number of a person who could deliver the methamphetamine.  (*Id.* at 2-3.)  That phone number belonged to Hugo Higuera-Acosta ("Higuera-Acosta"), who is Defendant's co-defendant in this case.  (*Id.*)  During an ensuing telephone call, Higuera-Acosta and the

CS arranged to meet at a designated location to complete the transaction.  (*Id.* at 3.)

At approximately 6:30 p.m. on February 13, 2024, DEA agents observed a Kia Spectra arrive in the vicinity of the designated meeting location.  (*Id.*)  There were two occupants in the vehicle: Higuera-Acosta and Defendant.  (*Id.*)  Eventually, "DEA agents saw the passenger of the Kia Spectra (Higuera-Acosta) exit the vehicle with a gray bag which he placed on the rear passenger's seat of the CS's vehicle.  [Defendant], the driver of the Kia Spectra, remained seated in the driver's seat.  The CS then confirmed the presence of drugs in the gray bag, and immediately uniformed DEA officers in fully marked vehicles with lights and sirens activated swooped down upon the scene and arrested both defendants."  (*Id.*)  "Agents later confirmed that the gray bag contained over seven (7) kilograms of methamphetamine.  When [Defendant] was searched incident to arrest the agents found 57 grams of methamphetamine and 177 grams of fentanyl on his person.  He also had $902.00 in his wallet.  When the Kia Spectra was searched the agents found a black plastic bag underneath the front passenger's seat that contained 880 grams of methamphetamine."  (*Id.* at 4.)

### B.    **The First Part Of The Interrogation**

"After his arrest [Defendant] was read his *Miranda* rights and was interrogated by law enforcement at the arrest location."  (*Id.*)  The interrogation was recorded and Defendant has provided a transcript, which is 34 pages long.  (*Id.* at 16-49.)  For purposes of this order, the Court will characterize the first 13.5 pages of the transcript as "the first part of the interrogation" and the remaining pages as "the second part of the interrogation."[1]

The first part of the interrogation went as follows.  Special Agent Bedford of the DEA ("SA Bedford") began by asking for Defendant's name and inquiring if Defendant wanted any water.  (*Id.* at 16-17.)  Immediately afterward, SA Bedford provided the following *Miranda* warning: "Uh, look, you have the right to remain silent.  You have the

---

[1]    More specifically, the first part of the interrogation ends with Defendant's statement in the middle of transcript page 14 that "[m]eaning that once, in an apartment, drugs were found on me, and I pleaded guilty so it wouldn't . . . ." and the second part of the interrogation begins with SA Bedford's response: "Alright, if—if you help me, I'll help you."  (Doc. 46 at 29.)

right to have an attorney present.  Anything you say to me will be used against you in court.  Friend, if you can't afford the services of an attorney, we offer you one for free.  Do you understand your rights?"  (*Id.* at 17.)  After Defendant confirmed that he understood those rights, SA Bedford asked: "Can you answer a few questions I have?"  (*Id.*)  Defendant responded: "Yes."  (*Id.*)

Next, SA Bedford asked a series of questions about how Defendant arrived in the United States from Mexico, how long Defendant had been in the United States, and how Defendant came to arrive at the arrest location.  (*Id.* at 17-27.)  During this portion of the interview, SA Bedford did not make any threats or promises.  (*Id.*)  Among other things, Defendant admitted during this portion of the interview that he believed the pills in his pocket were oxycodone (*id.* at 27) and that the pills were not for his personal use (*id.* at 25).

Next, SA Bedford asked Defendant to provide the access codes for certain cell phones that law enforcement had seized.  (*Id.* at 27.)  Defendant responded: "I can't give it to you. . . .  I'm not gonna give it to you.  Why do I have to give it to you?"  (*Id.*)  SA Bedford, in turn, stated: "To confirm that there isn't much—much illegal information in here. . . .  Then, I imagine if you don't want to share the information you have, it's because you're very implicated. . . .  You're very involved.  Are you the top boss?  The head honcho."  (*Id.* at 27-28.)  Defendant responded: "[T]he boss was over there . . . ."  (*Id.* at 28.)  SA Bedford then stated: "You were . . . driving a car that had drugs in it."  (*Id.*)  Defendant responded: "For being stupid."  (*Id.*)  SA Bedford then stated: "For being stupid.  I agree.  But if I were in your situation—"  (*Id.*)  Defendant then interjected: "But what do you want?  Meaning, what are you offering me?"  (*Id.*)  SA Bedford responded by stating: "If I . . . were in your situation, I'd do whatever it takes to save myself."  (*Id.*)  Defendant then repeated: "Right, but what are you offering me to help me?  I honestly don't even know what's going on for sure."  (*Id.*)  SA Beford responded: "Okay then, we contacted you . . . .  [Y]ou had pills, and we found . . . more drugs in . . . the car, and you were driving that car.  See I mean?  So, it's a bit complicated.  You have—you already have a

record . . . ." (*Id.* at 29.) Defendant then interjected: "Meaning that once, in an apartment, drugs were found on me, and I pleaded guilty so it wouldn't . . . ." (*Id.*)

### C.    The Second Part Of The Interrogation

At this point in the interrogation, SA Bedford made the first statement that Defendant's motion seeks to challenge as impermissibly coercive. (*Id.* at 4.) Specifically, SA Bedford stated: "Alright, if—if you help me, I'll help you. . . . So, this is what I'm telling you: I'm going to say the same thing to everyone: if you get more for me, I'll help you. If you don't get me anything, good luck to you." (*Id.* at 29.)

In response, Defendant stated: "I'm gonna be hones[t]—I . . . just got here." (*Id.* at 30.) SA Bedford responded: "Very well, welcome, ok. You just got here. If you get me more, I'll help you. Otherwise—" (*Id.* at 31.) Defendant then interjected: "You're going to help me?" (*Id.*) SA Bedford responded: "Depends on what you want." (*Id.*) Defendant then stated: "Send me back to Mexico and I'll help you." (*Id.*) After SA Bedford responded by saying "Help me," Defendant repeated: "Send me back to Mexico and I'll help you." (*Id.*)

SA Bedford expressed incredulity at this offer, stating: "So, according to your story, I send you back to Mexico and you'll call me and tell me, 'Officer, there's more drugs here.'" (*Id.*) When Defendant confirmed that this was, in fact, the type of cooperation he was offering, SA Bedford stated: "Friend, in your head, does that sound right?" (*Id.*) SA Bedford then added: "Because I'm a man of my word . . . [and] you're a criminal." (*Id.* at 31.) Unprompted, Defendant then provided the following description of how he came to be involved in the events that led to his arrest, which was punctuated only by follow-up questions (and not threats or promises) by SA Bedford:

Defendant:    That's how they screwed me over, you see.

SA Bedford:  Who?

Defendant:    Well, I was told, "drive," like an idiot.

SA Bedford:  You didn't . . . want to get out of the car.

Defendant:     Because I'm in the car; you guys got me out.

SA Bedford:  Yes, we helped you out.

Defendant:     No.  If you guys recorded everything, you didn't help me out.
Uh, you're forcing me to get out of the vehicle.

SA Bedford:  Why didn't you want to get out?

Defendant:     And why—and why did you stop it like that?

SA Bedford:  Were you afraid . . . [o]f the police?

Defendant:     That, too.

SA Bedford:  Yeah?  Why . . . would someone with drugs be afraid of the
police?

Defendant:     Well, I know I'm going to jail.

(*Id.* at 31-32.)

At this point in the interrogation, SA Bedford stated: "Uh, okay, alright.  So, not to
go to jail, you need to be with us, and if you get me more drugs, I'll help you." (*Id.* at 32.)
In response, Defendant stated: "But I'm not gonna lie to you.  I don't know where there
are any." (*Id.*)  SA Bedford then stated: "If you don't know, tell me. . . .  You just have to
say, 'Officer, I don't know anything', you take [sic] to jail.  Okay, alright.  Let's go.  And
we'll take you, gladly.  You understand me?  Two paths in life: the path with us, and the
path against us.  And the path against us, I swear, life will be more complicated.  I swear,
you're gonna start your . . . time in the United States in Florence, in the federal jail.  If you
help me, I'll help you. . . .  Because the amount you have, ouch, it's complicated.  It's not
for personal use.  We're talking about . . . years, decades that you can be in custody.  How
old are you?" (*Id.* at 32-33.)  After Defendant responded that he was 30 years old, SA
Bedford continued: "Okay, alright, so . . . I don't care about what would move you to tell
me where there's more.  But if you say to me, 'Look, there's more in this house', that's
fine, friend, no one will know anything.  I'll help you." (*Id.* at 33.)  In response, Defendant
stated: "That's what they say, and then they get killed back in Mexico." (*Id.* at 34.)  SA

- 5 -

Bedford responded: "Okay, friend, there's a risk that the dude won't kill you [sic] when you're . . . delivering drugs to/for [vague in Spanish] them." (*Id.*)  Defendant then stated: "Let me go and I'll tell you—I'll give you an address, but honestly, I don't know it.  I can take you to drive by it."  (*Id.*)  Following this statement, SA Bedford and Defendant engaged in the following exchange:

> SA Bedford: Okay, then . . . I'll put you in here, in the car, and we go to that house.
>
> Defendant:  No, but I don't—so I don't know how to give you.
>
> SA Bedford: [F]riend.  I'm giving you all the chances I . . . can.
>
> Defendant:  Uh, and if you don't find anything in the house, because I don't know when there will be something, I know that at times—
>
> SA Bedford: All I want is for you to make an effort.  If . . . you give me—
>
> Defendant:  So let me go, and I'll help you.
>
> SA Bedford: Okay.
>
> Defendant:  I'm gonna get fucked.

(*Id.*)

At this point in the interrogation, SA Bedford again asked Defendant for the access codes to the phones.  (*Id.* at 35.)  In response, Defendant stated that the phones were "new" and "don't have anything."  (*Id.*)  SA Bedford then stated: "That's fine.  If they're new, it's fine.  If they're old, it's also fine.  Friend, I swear, I swear that if we find information through him or the other one, you're gonna miss out on the chance to . . . ."  (*Id.*)  After some back and forth, Defendant stated: "So if I talk, they're gonna kill me, I have a family."  (*Id.*)  After some additional back and forth, SA Bedford stated: "Then, if you don't know anything, I'm not going to tell them anything in Mexico.  If you want to snitch on Mexico, it's fine, friend."  (*Id.* at 36.)

A few moments later, Defendant stated: "[W]hat are you promising me?"  (*Id.*)  SA Bedford responded: "That I'm going to talk to the prosecutor who's prosecuting this case,

and I'm going to tell him, 'Look, this . . . dude just got here 10 hours ago, and he has nothing to do with anything.' No, no, no, no, let me . . . finish. 'And after we . . . arrested him, he was immediately trying to regret it, and he helped us as much as he could.' You understand what I mean? You do your part; I'll do my part. If not, let's go." (*Id.* at 36-37.) Defendant then followed up: "[B]ut . . . what are you promising me? I'm still going to jail. And what if you don't find anything?" (*Id.* at 37.) SA Bedford responded: "It depends on what we find. . . . I can't . . . guarantee anything, because the same way you can't tell me, 'Look, there's more [unintelligible]' If you tell me, 'Look, officer—'" (*Id.*) Defendant then interjected: "You think that if I knew I wouldn't tell you, 'There's this stuff here,' and I'd leave or work it out? But, uh, I don't—why would I tell you lies. I don't know for sure." (*Id.* at 38.) SA Bedford responded: "Friend, you already—you already said why you don't want to go to jail. As far as I'm concerned, I don't care if you're in jail." (*Id.*) After some back and forth, SA Bedford added: "So, you have to worry about only one criminal. And that criminal is you. We're burning daylight; my patience is running out, my interest in . . . helping you." (*Id.* at 38-39.)

Defendant responded to this statement by again claiming "I don't know if they have drugs." (*Id.* at 39.) SA Bedford responded: "Friend, we're near, we're near, and if I find out the address without your help, how can I help you? We're near." (*Id.*) Defendant responded: "Then . . . I can't help you, and you can't help me, either. I might as well get fucked." (*Id.*) SA Bedford responded: "Okay, that's fine, friend. Uh, so, when you're sitting on a bench in Florence Prison, today, in a few hours, and there's no one that can help you, you're gonna be thinking, 'Fuck, I should've told the officer . . . .'" (*Id.*) Defendant responded: "You're not promising me anything, either. If I'm going to jail, what's the use?" (*Id.*) SA Bedford then responded by stating, "[h]ow do you know you're going to jail?", and Defendant stated: "Assure me that I'm not going to jail, and, uh, I don't know." (*Id.* at 40.)

SA Bedford did not directly respond to this request for assurance—instead, he asked Defendant: "Are there more drugs?" (*Id.*) After some back and forth on that topic,

1    Defendant again stated: "Well, give me an assurance.  It'll result—" (*Id.*)  SA Bedford

2    interjected: "I assure you." (*Id.*)  Defendant responded: "[I]n me not going to jail? (*Id.*)

3    SA Bedford then stated: "Depending on what you do.  If you tell me . . . if you tell me,

4    'Officer David, there are drugs in this house.'  And I go to that house and there's an old

5    man at death's door living there, how can I help you?  Because it's a lie.  If everything

6    cooperates [sic] with the information we already have, then I'll do my part.  But if you tell

7    me lies, how can I . . . help . . . a liar?" (*Id.* at 41.)  After some back and forth, Defendant

8    asked: "But who can assure me that . . . you're not gonna screw me over?" (*Id.* at 42.)  SA

9    Bedford began responding by stating: "Because we do this work every single fucking day,

10   and the people who help me—" (*Id.* at 42.)  Defendant then interjected: "You know, the

11   fuck, I'm gonna help you, but do me a favor also." (*Id.*)  SA Bedford then stated: "Okay.

12   So, do yourself a favor." (*Id.*)  In response, Defendant stated that his information would

13   "fuck them up good" and then began describing his children. (*Id.*)  SA Bedford interjected:

14   "Alright. Friend, my job is not to put at too much risk the families of the people we put in

15   jail.  So, to me, look—" (*Id.*)  Defendant then interjected: "Right.  You're gonna put me

16   in jail, then?" (*Id.*)  SA Bedford responded: "No, it depends on what you do, friend.  You

17   do your part. . . .  I don't want . . . to put you in jail. The reason why—" (*Id.* at 43.)

18           After Defendant attempted to interject, SA Bedford continued: "Listen up—Yes,

19   sure.  Look, the reason you're here with us, you know why?  Because someone was in this

20   same position, and . . . he didn't want to be there anymore.  What he did is, he helped

21   himself, and he put you in . . . in this position.  So, you do your part so you're not—" (*Id.*)

22   At this point, Defendant interjected: "I do understand, but I'm gonna be honest with

23   you . . . .  No one pointed a finger at me, because . . . you don't know anything about me,

24   because I just got here.  I'm fucked, because I was with this dude. . . .  I'm fucked because

25   I was driving, and because he put those things in the bag.  I'm fucked in that regard.  If you

26   promise me that you're not gonna . . . lock me up, then I . . . can take you to the address

27   where we went.  But I don't know about the kinds of deals." (*Id.* at 43-44.)

28           At this point in the interrogation, Defendant asked for permission to place a phone

call to his wife.  (*Id.* at 44.)  SA Bedford responded: "No, give me the address, friend."  (*Id.* at 45.)  Defendant then described the general vicinity of a house where he believed more drugs might be located.  (*Id.*)  After providing that description, Defendant stated: "But, uh, are you gonna fucking lock me up?"  (*Id.*)  SA Bedford responded by stating that "I have to collaborate [sic] what you tell me" (*id.* at 45) and then asking additional questions about the specific location of the house.  (*Id.* at 46-47.)  Eventually, Defendant stated: "If you take me . . . I'll tell you, 'That house over there.'"  (*Id.* at 47.)  SA Bedford then placed Defendant in a service vehicle, offered Defendant some water, and engaged in some additional discussion regarding the location of the house.  (*Id.* at 47-48.)  Soon afterward, the interrogation ended.  (*Id.* at 48-49.)

II.    Procedural History

On January 6, 2025, Defendant filed the motion to suppress.  (Doc. 46.)

On January 17, 2025, the government filed a response.  (Doc. 49.)

On January 20, 2025, Defendant filed a reply.  (Doc. 52.)

On February 13, 2025, the Court issued a tentative ruling.  (Doc. 76.)

On February 20, 2025, the Court heard oral argument.  (Doc. 81.)

**DISCUSSION**

I.    The Parties' Arguments

Defendant moves to suppress the entirety of his post-arrest statement to SA Bedford on February 13, 2024, as well as his efforts to attempt to direct SA Bedford to the house where more drugs would be located, on the ground that "these statements and actions are involuntary and defendant's will was overborn because they are the result of threats of incarceration and promises of leniency by law enforcement."  (Doc. 46 at 1.)  Defendant argues that although "[i]nterrogating officers can make false representations concerning the crime or the investigation during questioning without always rendering an ensuing confession coerced . . . false promises stand on a different footing."  (*Id.* at 10, citations omitted.)  Defendant then provides a lengthy string cite of cases from outside the Ninth Circuit in which various confessions were deemed involuntary.  (*Id.* at 10-13.)  Defendant

concludes: "In the present case the DEA agents made multiple threats of incarceration, and promises of leniency.  As a result of these coercive tactics, [Defendant] made incriminating statements indicated that he may have committed a crime, and he offered and even attempted to direct the officers to other nearby drug trafficking activity—conduct which may be interpreted as consciousness of guilt and involvement in the present offense. Consequently, pursuant to the above authority, as well as the Fifth Amendment to the United States Constitution, it is clear that the coercive law enforcement interview tactics which led to the incriminating statements and actions on the part of [Defendant] rendered his confession involuntary under the totality of the circumstances, and it should be suppressed in its entirety."  (*Id.* at 13-14.)

In response, the government argues that all of Defendant's statements and actions should be deemed voluntary because Defendant "was interrogated immediately following his arrest"; "knew well the offense he was suspected of committing and even referenced his prior conviction for drug distribution"; "was accurately informed of his right to remain silent, the consequences of his statements, and his right to an attorney"; "was thirty years old, demonstrated normal intelligence, spoke candidly and calmly with the officer, and was free from cold, heat, or exhaustion"; was interrogated for a "total time" of only "approximately thirty minutes" and was offered water several times; and had prior "experience with the criminal justice system" that makes "clear he knew the nature and seriousness of engaging with law enforcement" and "was on full display when the defendant began negotiating benefits for his knowledge of where other drugs might be." (Doc. 49 at 5-6.)  The government also emphasizes that SA Bedford "did not lie to the defendant about the evidence against him."  (*Id.* at 6-7.)  Finally, the government argues that because it "does not intend to introduce" any statements made after the "purported promises of leniency," the "Court may not need to rule on the voluntariness of the contested portion of the defendant's admissions."  (*Id.* at 1.)

In reply, Defendant argues that the government's stated intention not to introduce certain portions of his statement should be viewed as a concession "that the misconduct on

the part of law enforcement in this case rendered his inculpatory statements involuntary, and therefore inadmissible." (Doc. 52 at 1-2.)  Next, Defendant identifies the statements by SA Bedford that he views as constituting impermissible threats and promises.  (*Id.* at 2-3.)  Next, Defendant argues that the Court lacks "authority to admit some portions of a coerced confession while suppressing other parts" and that "[i]t would be absurd to think that a first, partial confession made before the police misconduct occurred is admissible, and that a latter portion of the same confession, induced by threats and promises, is inadmissible." (*Id.* at 3-4.)  Defendant adds: "If a confession is deemed unreliable due to coercion or contamination, it should be excluded in its entirety to prevent wrongful convictions and to maintain the integrity of the criminal justice system. . . .  Indeed, to 'split the baby' and allow the Government to introduce a self-serving portion of the contaminated confession and to stipulate to suppressing another portion would not serve the societal purposes of deterring police misconduct and preventing false statements from being presented to the jury." (*Id.* at 5.)  Defendant concludes: "The Government should not be allowed to 'cure' a due process violation by cherry-picking which portions of the involuntary confession they want to admit at trial, and which portions they do not." (*Id.* at 6.)

II.    Analysis

"The Government bears the burden of proving that [a defendant's] statements were voluntary and must do so by a preponderance of the evidence."  *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).

"An involuntary or coerced confession violates a defendant's right to due process under the Fourteenth Amendment and is inadmissible at trial.  To determine whether a confession is involuntary, we must ask whether a defendant's will was overborne by the circumstances surrounding the giving of a confession, considering the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.  The characteristics of the accused can include the suspect's age, education, and intelligence as well as a suspect's prior experience with law enforcement and the

suspect's maturity. The potential circumstances of the interrogation include its length and location, and the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation." *Balbuena v. Sullivan*, 980 F.3d 619, 629 (9th Cir. 2020) (cleaned up). "Each of these factors, in company with all of the surrounding circumstances—the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control—is relevant." *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (en banc) (cleaned up).

Applying these standards, the Court concludes the government has met its burden of establishing that all of Defendant's statements and actions during the interrogation were voluntary—and, thus, nothing is subject to suppression.

## A.    The First Part Of The Interrogation

The analysis is most straightforward when it comes to the inculpatory statements Defendant made during the first part of the interrogation, which include that he believed the pills in his pocket were oxycodone and that the pills were not for his personal use. (Doc. 46 at 25, 27.) As noted, the first considerations when assessing voluntariness relate to the characteristics of the accused. *Balbuena*, 980 F.3d at 629. Those considerations cut overwhelmingly in favor of a finding of voluntariness here. Defendant was 30 years old at the time of the interrogation, does not dispute the government's assertions that he "demonstrated normal intelligence" and "spoke candidly and calmly" during the interrogation, and also does not dispute the government's assertions that he had significant prior "experience with the criminal justice system, given his prior felony convictions, multiple prior arrests, and multiple prior immigration removals." (Doc. 49 at 6.) Indeed, Defendant was convicted in October 2015 of a state-law drug trafficking offense and sentenced to six months' incarceration. (Doc. 54.) Defendant was also prosecuted for an earlier federal drug trafficking offense in a case that resulted in an acquittal. (Doc. 3 at 2 [bail report, with notation that Defendant was arrested in October 2013, charged with a pair

of drug trafficking offenses, and "Acquitted" in December 2014].) The records related to that acquittal are also subject to judicial notice. (*United States v. Montiel et al.*, 4:13-cr-01628-JGZ-LAB, Dkt. No. 287 [minute entry reflecting Defendant's acquittal in December 2014 following a four-day jury trial].)

The other considerations when assessing voluntariness relate to the circumstances of the interrogation. *Balbuena*, 980 F.3d at 629. As applied to the first part of Defendant's interrogation, those considerations again cut overwhelmingly in favor of a finding of voluntariness. The transcript reflects (and Defendant does not dispute) that Defendant was offered water and properly advised of his *Miranda* rights at the outset of the interrogation, and the government asserts (and Defendant does not dispute) that the interrogation took place immediately after Defendant's arrest, that the interrogation only took 30 minutes from start to finish, and that the interrogation involved "no exposure to environmental factors, no exhaustion, [and] no 'tag-teaming.'" (Doc. 49 at 6-7.)

Notably, the sole reason why Defendant contends suppression is warranted is because SA Bedford made improper "threats of incarceration and promises of leniency." (Doc. 46 at 1.)[2] However, it is undisputed that SA Bedford did not begin making any of the challenged statements until approximately midway through the interrogation. The first challenged statement identified in Defendant's motion—which is SA Bedford's statement "if you help me, I'll help you" (Doc. 46 at 4)—does not appear until page 14 of the transcript of the interrogation (*id.* at 29). By that point, Defendant had already admitted

---

[2]    During oral argument, defense counsel asserted for the first time that suppression is warranted for a reason unrelated to SA Bedford's alleged threats and promises—because during the arrest sequence, the agents drew their service weapons and broke the side window of Defendant's car. Counsel also introduced a photograph of the broken window. As an initial matter, these details are not properly before the Court because they are not mentioned in Defendant's motion papers and Defendant did not request an evidentiary hearing. At any rate, these details do not come close to supporting a finding of involuntariness—there is no suggestion (let alone evidence) that the SA Bedford ever brandished his weapon or indeed engaged in any sort of intimidating physical behavior during the interrogation itself. *Cf. United States v. Vanbrackle*, 397 F. App'x 557, 562-63 (11th Cir. 2010) ("We agree with the district court that the totality of the circumstances demonstrate that Vanbrackle's statements to law enforcement officers were voluntary. . . . While approximately eight law enforcement officers participated in the execution of the search warrant, some of whom had their guns drawn upon entry, neither Blackwell nor Witrick drew their guns during the interview, and no one stood guard over Vanbrackle.").

1    that the pills in his possession were not for personal use (*id.* at 25) and were believed to be

2    oxycodone (*id.* at 27).[3]

3        Any statements by Defendant that occurred before SA Bedford began engaging in

4    the challenged conduct cannot possibly be categorized as involuntary or the product of

5    coercion.  As the Ninth Circuit has recognized, a person cannot be coerced into making a

6    statement by an event that hasn't occurred yet.  *United States v. Phillips*, 569 F. App'x 542,

7    543 (9th Cir. 2014) ("Phillips's involuntariness argument fails both factually and legally.

8    Factually, no purportedly overbearing promises induced the confession: Phillips admitted

9    to the relevant conduct for the offense early in the interrogation, *before* the discussion of

10   leniency.").  *See also United States v. Glover*, 104 F.3d 1570, 1580 (10th Cir. 1997)

11   ("[A]lthough Kozak argues on appeal that her confession was coerced by promises of

12   leniency (*i.e.*, a release on her own recognizance), she testified at the suppression hearing

13   that those discussions did not occur until after the interview.  In light of these [and other]

14   facts, it is clear that Kozak's will was not overborne and that her confession was the product

15   of her own free will."); *United States v. Grant*, 2016 WL 1456795, *3 (N.D. Ala. 2016)

16   ("[T]his exchange between Grant and Sergeant House [about possible leniency] did not

17   occur until after Grant gave his oral and written consent to the search of his iPhone 5s and,

18   so, could not have coerced either expression of consent.").  *Cf. Aston v. Johnson &*

19   *Johnson*, 248 F. Supp. 3d 43, 51 (D.D.C. 2017) ("Barring some sort of temporal paradox,

20   *see* H.G. Wells, The Time Machine 22-23 (1895), there is no way that suppression of an

21   FDA report in 2013 could have caused plaintiffs to be injured in 2012 or earlier.").

22       In a related vein, there is no merit to Defendant's contention that a "statement" must

23   be conceptualized as a single unit that becomes "contaminated" in its entirety once a law

24   enforcement official has been shown to have engaged in an improper interrogation

25   technique at any point during an interrogation.  Defendant has tellingly failed to identify

26

27   [3]    During oral argument, defense counsel asserted that the first coercive statement was
     actually SA Bedford's statement—which appears in the middle of page 13 of the
28   transcript—that "if I were in your situation . . . ."  (Doc. 26 at 28.)  Putting aside the fact
     that Defendant did not make this argument in his motion papers, the "if I were in your
     situation" statement still occurred after Defendant made the two admissions noted above.

any judicial decision adopting such a rule and there are many decisions rejecting it.  For example, in *United States v. Whitfield*, 695 F.3d 288 (4th Cir. 2012), the district court concluded that the defendant's confession to a pair of burglaries during "the 'first part' of the police interview" was voluntary but his confession to an attempted bank robbery "obtained at the conclusion of the 'second part' of the interview" was involuntary because the police had engaged in coercive interrogation techniques before obtaining the latter confession.  *Id.* at 295-96.  At trial, the district court allowed the government to introduce the burglary-related confession from the first part of the interview.  *Id.* at 301 ("Whitfield . . . contends that the district court erred by declining to suppress his confessions to the two Belmont home break-ins . . . Whitfield agrees, of course, that the court properly suppressed his confession to the attempted bank robbery (a ruling not challenged by either party on appeal).  He nevertheless maintains that his other two confessions should have been suppressed because the officers used coercive tactics in the interview process.").  The Fourth Circuit affirmed in relevant part, emphasizing that "we are struck by the district court's perceptive and sensible differentiation between the two parts of the post-arrest interview of Whitfield" and concluding that "[d]uring the first part of the police interview, Whitfield's statements pertaining to the two Belmont home break-ins . . . were voluntarily made."  *Id.* at 301-03.

Similarly, in *United States v. Syslo*, 303 F.3d 860 (8th Cir. 2002), a husband and wife made an array of inculpatory statements while being interrogated and later "moved to suppress their statements, arguing that their *Miranda* waivers were invalid and that their confessions had been coerced."  *Id.* at 864.  The district court "suppressed most of the statements made by Denell [the wife] during the second part of her interview because it found they were the product of coercive questioning and thus involuntary" but declined to suppress Denell's statements during the first part of her interview.  *Id.*  The Eighth Circuit affirmed, concluding that although the district court properly "exercised its independent judgment to exclude incriminating remarks that Denell made during the second part of her interview," "the statements made . . . by Denell which were not suppressed by the district

court were knowing, intelligent, and voluntary and that their constitutional rights were not violated." *Id.* at 868.

These outcomes are unsurprising because the contrary approach urged by Defendant would defy common sense, as noted in *Phillips* and in some of the cases cited in Defendant's motion. *Sharp v. Rohling*, 793 F.3d 1216, 1233 (10th Cir. 2015) ("Upon de novo review of Detective Wheeles's interview with Ms. Sharp, we conclude her incriminating statements *after Detective Wheeles promised she would not go to jail* were involuntary.") (emphasis added). Nor do courts follow Defendant's proposed approach in related contexts, such as *Miranda* violations. *See, e.g., United States v. Ward*, 2018 WL 4323811, *7 (D. Conn. 2018) ("Ward . . . contends that the agents' conduct in failing to terminate the interrogation after Ward said 'I'm done talking' so blatantly violated his rights that the Court should suppress all statements obtained from him on January 6, 2017, including those uttered prior to the assertion of the right to end the interview, as a sanction for misconduct. . . . But he points to no precedent—and I am aware of none—suggesting that even a deliberate violation of *Miranda* requires suppression of the statements a defendant made *before* the violation occurred.").[4]

For these reasons, Defendant's request to suppress the statements he made during the first part of the interrogation is denied.

### B.     The Second Part Of The Interrogation

The government asserts that because it does not intend to introduce, during its case in chief, any of Defendant's statements during the second part of the interrogation, the Court "may not need to rule on the voluntariness of" those statements. (Doc. 49 at 1.) The

---

[4]     During oral argument, defense counsel asserted that cases addressing the divisibility of confessions in which a *Miranda* violation occurred are irrelevant when assessing the divisibility of a confession in a case, such as this one, where the claim is that the defendant was subjected to an impermissibly coercive interrogation technique. The Court disagrees—in both scenarios, the reason why the earlier portion of the statement remains admissible is because it could not possibly have been caused by the subsequent violation. Nevertheless, even if the *Miranda* cases were disregarded, there is ample authority for the proposition that statements made during the first part of an interrogation remain admissible even if the defendant was later subjected to impermissibly coercive interrogation techniques that vitiate the voluntariness of the defendant's subsequent statements. *Phillips*, 569 F. App'x at 543; *Whitfield*, 695 F.3d at 301-03; *Syslo*, 303 F.3d at 868.

1  Court disagrees—the government has not disavowed the possibility of using those

2  statements for impeachment purposes, should Defendant choose to testify, and although

3  "[s]tatements made by a defendant in circumstances violating the strictures of *Miranda* . .

4  . are admissible for impeachment if their trustworthiness satisfies legal standards . . . any

5  criminal trial use against a defendant of his *involuntary* statement is a denial of due process

6  of law." *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978) (cleaned up).

7        Nevertheless, on the merits, Defendant's statements and conduct during the second

8  part of the interrogation were not involuntary and are not subject to suppression.  As noted,

9  the voluntariness analysis involves two sets of considerations: (1) the characteristics of the

10  accused; and (2) the details of the interrogation.  *Balbuena*, 980 F.3d at 629.  Here, for the

11  reasons discussed in Part II.A above, the characteristics of the accused overwhelmingly cut

12  in favor of voluntariness.  Those characteristics did not somehow change between the first

13  and second parts of the interrogation—Defendant remained a 30-year-old with normal

14  intelligence, a calm demeanor, and significant experience with the criminal justice system.

15        Turning to the details of the interrogation, many of the details that compel a finding

16  of voluntariness during the first part of the interrogation—its short length, the absence of

17  tag-teaming or exhaustion, the valid *Miranda* warning, the offers of water—were also

18  present during the second part of the interrogation.  The only difference is that SA Bedford

19  began making statements during the second part of the interrogation that, in Defendant's

20  view, amount to improper threats and promises.

21        As an initial matter, those statements were prompted by *Defendant's* repeated

22  requests for SA Bedford to identify the benefit that Defendant would receive in return for

23  cooperation.  For example, after SA Bedford stated, "But if I were in your shoes—,"

24  Defendant interrupted by stating: "But what do you want?  Meaning, what are you offering

25  me?"  (Doc. 46 at 28.)  After SA Bedford then stated, "if you help me, I'll help you,"

26  Defendant asked: "[H]ow do you want me to help you, and how are you gonna help me?"

27  (*Id.* at 29.)  Initially, SA Bedford responded to those questions by generally noting that

28  Defendant would help himself by cooperating, without providing any specifics.  (*Id.* at 29

"[I]f you help me, I'll help you. . . .  So, this is what I'm telling you: I'm going to say the same thing to everyone: if you get more for me, I'll help you.  If you don't get me anything, good luck to you."].)  These statements by SA Bedford were entirely permissible.  *See, e.g., United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) ("An interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect."); *United States v. Brandon*, 633 F.2d 773, 777 (9th Cir. 1980) ("We reject the defendant's contention that the agents' promise to bring the fact of Bracelin's cooperation to the attention of the United States Attorney and to recommend leniency, and Bracelin's expectation of it, constituted coercion.  Nor do we agree that a realistic description of an accused's predicament created by his violation of the criminal law, called to his attention to obtain his cooperation with Government agents, will vitiate his consent.").

Next, Defendant identified the specific benefit he hoped to obtain in return for cooperation: "Send me back to Mexico and I'll help you."  (Doc. 46 at 30.)  SA Bedford responded by rejecting that request as unrealistic: "Friend, in your head, does that sound right?"  (*Id.*)  That rejection was not improper or coercive.

Following that exchange, and before SA Bedford made any of the other comments that Defendant now seeks to challenge as coercive, Defendant made additional inculpatory statements, including that he didn't want to get out of the car during the arrest sequence because "I know I'm going to jail."  (*Id.* at 32.)  As discussed in Part II.A above, that inculpatory statement cannot be viewed as the product of coercion when no coercive conduct had occurred yet.  *Phillips*, 569 F. App'x at 543; *Glover*, 104 F.3d at 1580; *Grant*, 2016 WL 1456795 at *3.

Immediately following Defendant's statement about going to jail, SA Bedford stated: "So, not to go to jail, you need to be with us, and if you get me more drugs, I'll help you."  (*Id.*)  After Defendant responded by claiming not to know where the additional drugs

were located, SA Bedford again suggested that Defendant would go to jail if he failed to cooperate but could avoid jail if he assisted in the recovery of additional drugs: "If you don't know, tell me. . . .  You just have to say, 'Officer, I don't know anything', you take [sic] to jail.  Okay, alright.  Let's go.  And we'll take you, gladly.  You understand me?  Two paths in life: the path with us, and the path against us.  And the path against us, I swear, life will be more complicated.  I swear, you're gonna start your . . . time in the United States in Florence, in the federal jail.  If you help me, I'll help you. . . .  Because the amount you have, ouch, it's complicated.  It's not for personal use.  We're talking about . . . years, decades that you can be in custody."  (*Id.* at 32-33.)  Although these statements are ambiguous, it is possible to construe them—at least in isolation—as unqualified promises that Defendant would avoid prosecution and jail time if he cooperated with law enforcement by assisting in the recovery of additional drugs.

Defendant argues this type of promise is impermissibly coercive.  In support, Defendant cites cases holding that it is impermissibly coercive for an interrogator to make an unqualified promise that a suspect will avoid jail time or receive a reduced sentence by confessing.  *Sharp*, 793 F.3d at 1234 ("Detective Wheeles's response was no mere limited assurance of putting in a good word with the prosecutor.  He flatly rejected Ms. Sharp's concern about going to jail, without equivocation.  He did not say the charging decision was in the prosecutor's hands.  He did not express uncertainty about her fate. . . .  Detective Wheeles's promise she would not go to jail induced her confessional statements because he made clear there would be no cost of disclosure.  He gave Ms. Sharp a get-out-of-jail-free card, and she obliged by giving him more incriminating details.  Ms. Sharp therefore did not simply balance personal considerations with the possible cost of disclosure when making her subsequent confessional statements.  Instead, his promise was of the sort that may indeed critically impair a defendant's capacity for self-determination.") (cleaned up); *United States v. Lopez*, 437 F.3d 1059, 1064 (10th Cir. 2006) ("[Agent] Hopper used these sheets of paper to inform Lopez that if he stated that his alleged actions were a mistake, he would get six years in prison.  On the other hand, if Lopez did not confess and explain that

his actions were the result of a mistake, he would face sixty years in prison. This is not a vague and non-committal promise. Rather, it is a promise that Lopez will spend fifty-four fewer years in prison if he confesses.") (cleaned up). *See also United States v. Lall*, 607 F.3d 1277, 1287 (11th Cir. 2010) ("[T]he only plausible interpretation of [Detective] Gaudio's representations, semantic technicalities aside, was that the information Lall provided would not be used against him by Gaudio or anyone else. Under these circumstances, Gaudio's statements were sufficient to render Lall's confession involuntary and to undermine completely the prophylactic effect of the *Miranda* warnings Gaudio previously administered.").

For four overlapping reasons, the Court disagrees and concludes that SA Bedford's challenged statements were not impermissibly coercive and did not render Defendant's subsequent statements and actions involuntary. First, by the time SA Bedford made the first challenged statements about avoiding jail time, Defendant had already made a wide range of inculpatory admissions, including that he believed the drugs in his possession were oxycodone, that the drugs were not for personal use, and that he believed he would go to jail for his conduct. (Doc. 46 at 25, 27, 32.) Given that chronology, it is difficult to see how the challenged statements by SA Bedford could be viewed as the development that caused Defendant's will to be overborne—he had already chosen to confess before that development. *Cf. Phillips*, 569 F. App'x at 543 ("[N]o purportedly overbearing promises induced the confession: Phillips admitted to the relevant conduct for the offense early in the interrogation, *before* the discussion of leniency.").[5]

Second, although Defendant's motion papers suggest that a confession is always involuntary if obtained via "direct or implied promises, however slight" (Doc. 46 at 10),

---

[5]    During oral argument, defense counsel emphasized that, in *Sharp*, the defendant had already made some inculpatory admissions by the time of the challenged conduct and the Tenth Circuit still concluded that the defendant's subsequent statements were involuntary. Even so, the Court does not construe this fact-bound outcome as prohibiting courts from considering all of the circumstances bearing on the voluntariness of a confession when determining whether a particular interrogation technique caused the defendant's will to be overborne. Nor would such an approach be consistent with Ninth Circuit law, under which "all attendant circumstances" of the interrogation must be considered. *Leon Guerrero*, 847 F.2d at 1366.

the Ninth Circuit has clarified that "[t]his broadly-stated rule has not been applied to invalidate, per se, all statements made by a suspect in response to a promise made by law enforcement personnel.  The promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances." *Leon Guerrero*, 847 F.2d at 1366. Here, the relevant "attendant circumstances" include Defendant's characteristics and the many benign features of the interrogation, which cut overwhelmingly against a finding of coercion for the reasons stated in earlier portions of this order.

In *United States v. Larry*, 126 F.3d 1077 (8th Cir. 1997), the Eight Circuit reached a similar conclusion.  There, "Larry was held overnight after he was booked on four felony charges stemming from [a] drive-by shooting.  The next day, the police informed Larry of his *Miranda* rights, and then told Larry he would be released from jail and not prosecuted for the drive-by shooting if he told them what he knew about the shooting.  Larry did so, making along the way his statement about [a] sawed-off shotgun." *Id.* at 1079.  Larry was subsequently prosecuted for illegally possessing ammunition. *Id.* at 1078.  Larry moved to bar consideration of his admission regarding the sawed-off shotgun, arguing that it was involuntary because it was coerced through a promise of no prosecution for the drive-by shooting, and the district court "ruled on a per se basis that 'a confession induced by a promise that there will be no prosecution is not voluntary.'" *Id.* at 1079.  The Eighth Circuit reversed the district court on that point, explaining that the district court should have "treat[ed] the promised non-prosecution as one of the circumstances to be considered in assessing the conduct of the police and the characteristics of the accused" and that when those other circumstances were taken into consideration—which included, similar to this case, that defendant "was thirty-one years old, he had a high school equivalency diploma, he had an extensive criminal history with thirteen earlier convictions, and his remarks to the police show he was not particularly susceptible to police pressure"—the only conclusion was that "Larry was neither coerced nor was his will overborne, and his statement was voluntarily given." *Id.* (citations omitted).

Third, SA Bedford did not promise that Defendant would avoid jail time or receive

a reduced sentence simply by *confessing* to the crime under investigation. Instead, SA Bedford linked the promise of no jail time to a specific form of *cooperation*—enabling law enforcement to seize additional drugs by guiding them to the stash house where those drugs were being stored. (Doc. 46 at 32 ["So, not to go to jail, you need to be with us, and if you get me more drugs, I'll help you."].) As the parties acknowledged during oral argument, Defendant never fulfilled this objective—the additional drugs were not recovered. In this respect, this case differs from *Sharp* and *Lall*, where the false nature of the promise of leniency factored into the voluntariness analysis. *Sharp*, 793 F.3d at 1234 ("[D]espite Detective Wheeles's assurance at the beginning of the interview—that he was 'not going to lie to [Ms. Sharp] in this investigation'—his promise that she would not go to jail was false or misleading."); *Lall*, 607 F.3d at 1287 ("Gaudio explicitly assured Lall that anything he said would not be used to prosecute him . . . [which] promise was deceptive.").[6] There was no false promise here because Defendant did not ultimately assist SA Bedford in seizing additional drugs.

Courts have declined to find coercion under analogous circumstances. For example, in *United States v. Perez*, 127 F.4th 146 (10th Cir. 2025), the defendant—similar to Defendant here—was "a 33-year-old . . . with a GED with no history of mental health or substance abuse treatment" who chose to make inculpatory statements after being given a *Miranda* warning during an interrogation that lasted less than an hour. *Id.* at 168. The defendant nevertheless argued that his *Miranda* waiver was involuntary because the agent interrogating him "improperly presented two options: (1) maintain silence, go to jail immediately, and get locked up at least 10 years, or (2) waive silence and help himself out, get the cuffs off, and pursue the only way to get any kind of sentence reduction, by cooperating." *Id.* The Tenth Circuit disagreed, holding that the challenged statement was permissible because it "correctly described the statutory penalty Perez faced for his

---

[6]    Likewise, in *Lopez*, the promise of leniency seemed to be false, although the Tenth Circuit did not specifically discuss its falsity when analyzing the question of voluntariness. *Lopez*, 437 F.3d at 1062, 1064 (interrogator promised the defendant "that if he stated that his actions were a mistake, he would get six years in prison," yet the defendant was subsequently charged "with malice aforethought murder occurring within Indian country").

upcoming charges"[7] and because the "comments about cooperation as the 'only way' for Perez to receive a sentence reduction were accurate as well." *Id.* at 168-69. The Court also rejected the defendant's argument that the "two options" statement rendered his confession involuntary, explaining that the agent "did not misrepresent any potential penalties. Perez was ultimately indicted on charges that carried a mandatory minimum of ten years and a maximum of life in prison. His failure to cooperate also resulted in his arrest and pretrial detention. [The agent] accurately described the penalties, so this discussion of penalties does not support an involuntary confession." *Id.* at 173. Later, the court added: "[W]e will assume for argument's sake that the agent's statement that he would 'get [Perez] out of here, get [Perez] out of [his] cuffs, clear this shit up,' amounts to more than a vague and non-committal statement. It includes direct actions that [the agent] promised in exchange for Perez's cooperation. And on the flip side, [the agent] made it clear that a failure to cooperate would result in criminal charges and a ride to jail that day. Yet even assuming these statements qualified as a promise of leniency, they did not render Perez so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action. . . . And as evidence that these statements did not overbear his will, we note that he didn't cooperate. When viewed against the totality of the circumstances, we conclude that [the agent's] statements did not make Perez's statements involuntary." *Id.* at 175-76 (cleaned up).

Similarly, in *United States v. Villalpando*, 588 F.3d 1124 (7th Cir. 2009), the defendant's "claim [was] simple. He claims that the investigating detective offered to keep him out of jail in exchange for his cooperation." *Id.* at 1129. The Seventh Circuit explained that "[t]his is true—but only to a limited extent. Unfortunately for Villalpando, the devil is in the details. . . . [I]t is clear from the transcript that the conversation between Villalpando and Detective Markham concerned his future cooperation with the

---

[7] Here, too, SA Bedford's statement that "[w]e're talking about—about years, decades that you can be in custody" (Doc. 46 at 33) accurately described Defendant's potential exposure—Defendant was subsequently indicted on three drug trafficking counts, each of which carries a statutory maximum penalty of at least 20 years. (Doc. 12.)

investigation of his supplier.  It was in the context of negotiating this future cooperation that Villalpando chose to come clean about what was in his apartment." *Id.*  Given those circumstances, the court concluded that "the actual promises made during the interview belie Villalpando's contention that he struck a bargain with the detective that would secure his release in return for information about his own drug possession." *Id.*

Fourth, at any rate, the transcript reveals that after SA Bedford made the first two challenged statements about avoiding jail, Defendant continued questioning SA Bedford about the nature of the benefit he could receive by cooperating and came to understand, through those additional discussions, that SA Bedford was not making the sort of unqualified "no jail time for a confession" promise at issue in *Sharp*, *Lopez*, and *Lall*.  For example, after Defendant asked what would happen "if you don't find anything in the house," SA Bedford initially began to explain that "[a]ll I want is for you to make an effort.  If . . . you give me—" before Defendant cut him off.  (Doc. 46 at 34.)  Soon afterward, after SA Bedford again pressed Defendant to provide the address of the house where additional drugs could be found, Defendant stated: "[W]hat are you promising me?"  (Doc. 46 at 36.)  SA Bedford responded: "That I'm going to talk to the prosecutor who's prosecuting this case, and I'm going to tell him, 'Look, this . . . dude just got here 10 hours ago, and he has nothing to do with anything.'  No, no, no, no, let me . . . finish.  'And after we . . . arrested him, he was immediately trying to regret it, and he helped us as much as he could.'  You understand what I mean?  You do your part; I'll do my part.  If not, let's go."  (*Id.* at 36-37.)  Defendant then followed up: "[B]ut . . . what are you promising me?  I'm still going to jail.  And what if you don't find anything?"  (*Id.* at 37.)  SA Bedford responded: "It depends on what we find. . . .  I can't . . . guarantee anything, because the same way you can't tell me, 'Look, there's more [unintelligible]'  If you tell me, 'Look, officer—'"  (*Id.*)

These exchanges are significant because they reveal that Defendant did not understand SA Bedford's initial statements as unqualified promises that he would avoid jail by confessing—to the contrary, Defendant said "what are you promising?  I'm still

going to jail."    Additionally, SA Bedford clarified that he was not "guarantee[ing] anything," that the benefit would "depend[] on what we find," and that he was simply offering to bring the nature of Defendant's cooperation to the attention of the "prosecutor," who would then decide how Defendant would be treated.  Such comments are permissible and not coercive.  *Leon Guerrero*, 847 F.2d at 1366-67 (citing, with approval, a Fifth Circuit decision in which "an FBI agent interrogating Watson, a suspect arrested on state charges, summoned the district attorney who told Watson that he would consider dropping the state charges if Watson cooperated with the FBI" and "[t]he court held that Watson's subsequent confession to federal bank robbery was voluntary").

The remaining portions of the interrogation followed the same pattern.  For example, although SA Bedford's later statement that Defendant would be "sitting on a bench in Florence Prison, today, in a few hours, and there's no one that can help you, you're gonna be thinking, 'Fuck, I should've told the officer . . . .'" (Doc. 46 at 39) might be seen as coercive when viewed in isolation, the transcript reveals that Defendant did not understand that statement as an unqualified promise of no jail time in return for confessing: "You're not promising me anything, either.  If I'm going to jail, what's the use?"  (*Id.*)

Next, after Defendant repeatedly asked SA Bedford to "[a]ssure me that I'm not going to jail" and "give me an assurance" (*id.* at 40), SA Bedford clarified: "Depending on what you do.  If you tell me . . . if you tell me, 'Officer David, there are drugs in this house.'  And I go to that house and there's an old man at death's door living there, how can I help you?  Because it's a lie.  If everything cooperates [sic] with the information we already have, then I'll do my part.  But if you tell me lies, how can I . . . help . . . a liar?"  (*Id.* at 41-42.)  As noted, this was not an impermissibly coercive statement because it conditioned the possibility of no jail time on Defendant's cooperation in the recovery of additional drugs.  *Perez*, 127 F.4th at 168-76; *Villalpando*, 588 F.3d at 1129.

And again, after Defendant described the general vicinity of a house where he believed more drugs might be located and then asked "But, uh, are you gonna fucking lock me up?", SA Bedford responded by stating that "I have to collaborate [sic] what you tell

me." (*Id.* at 45.)  This was consistent with SA Bedford's earlier statements that the benefit of avoiding jail time was contingent on the location and seizure of additional drugs—a contingency Defendant did not fulfill.

Finally, to the extent Defendant's position (as urged during oral argument) is that SA Bedford also engaged in impermissible coercion by making threats regarding Defendant's family and children, any such argument is not borne out by the record. Defendant attempts to liken this case to *State v. Polk*, 812 N.W.2d 670 (Iowa 2012), where an interrogator "crossed the line by combining statements that county attorneys 'are much more likely to work with an individual that is cooperating' with suggestions [the defendant] would not see his kids 'for a long time' unless he confessed." *Id.* at 676.  But here, it was Defendant who first brought up the topic of his family, by asserting "I have my family and because of my stupidity" after SA Bedford accurately noted the amount of prison time Defendant was facing.  (Doc. 46 at 33.)  In response, SA Bedford attempted to reassure Defendant that his family would not be endangered if he chose to cooperate: "[I]f you say to me, 'Look, there's more in this house,' that's fine, friend, no one will know anything." (*Id.*)  This reassuring, responsive comment is easily distinguishable from the type of coercive comment at issue in *Polk*.  Similarly, it was Defendant who first brought up the topic of his children, by asserting that "I have two small children, a one-year-old, what the fuck, and a two-year-old." (*Id.* 42.)  In response, SA Bedford again assured Defendant that "my job is not to put at too much risk the families of the people we put in jail." (*Id.*)  This is a far cry from *Polk*.  And again, it was Defendant who first brought up the topic of his wife, by stating: "Because my wife will be calling and I'm going to be getting calls." (*Id.* at 44.)  In response, SA Bedford stated: "Friend, if you want to call your wife, it's fine.  If you don't want to, it's fine." (*Id.*)  Also, although SA Bedford later asked Defendant to "[g]ive me the address, friend" after Defendant asked to call his wife (*id.* at 45), SA Bedford did not state (or even imply) that Defendant would be prohibited from communicating with his wife unless he cooperated.

…

Accordingly,

**IT IS ORDERED** that Defendant's motion to suppress (Doc. 46) is **denied**.

Dated this 24th day of February, 2025.

Dominic W. Lanza
United States District Judge